**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MEDILINK INSURANCE COMPANY, LIMITED,

           Plaintiff/Counter-Defendant,

v.                                  Case No. 09-13692

COMERICA BANK,

           Defendant/Counter-Plaintiff.

_____/

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
AND DENYING AS MOOT DEFENDANT'S MOTION IN LIMINE**

Pending before the court are cross motions for summary judgment by

Plaintiff/Counter-Defendant Medilink Insurance Company, Limited, and

Defendant/Counter-Plaintiff Comerica Bank, both filed on September 27, 2010.

Responses and replies were timely filed. All told, the parties filed 168 exhibits

supporting or opposing the motions. In addition to this extensive record filed by the

parties, the court held a hearing on January 5, 2011. For the reasons stated below, the

court will grant Comerica's motion for summary judgment and will grant in part

Medilink's motion for summary judgment.

**I. BACKGROUND**

The instant case arises out of the fraud or false pretenses of John P. Bender,

J.P. Bender & Associates, Inc., and Bender, Inc., (collectively and individually "Bender")

through 2007. At the relevant times, Medilink operated as a reinsurance company,

reimbursing payments of claims against certain hospitals in and around Detroit,

Michigan.  Medilink maintained certain accounts with the Institutional Trust Department of Comerica bank, which were used to reimburse payment of such claims ("Trust Accounts") and which were covered by contracts ("Trust Agreements") between Medilink and Comerica.  (Def. Mot. Ex. 19-21; Pl. Mot. 2-3.)  The parties agree that Comerica has not breached any provisions of these agreements.  (Def. Mot. Facts 7; Pl. Resp. Facts 7.)  The Trust Agreements include various clauses limiting the liability of Comerica, but Medilink challenges their applicability in this case.  (Def. Mot. Ex. 22.)

Bender also maintained demand deposit accounts with Comerica, with terminal digits x1154, x7866, and x7749 (collectively "Bender Accounts").  (Def. Mot. Ex. 26.) These accounts listed Bender as the sole owner and were covered by an account contract between Bender and Comerica.  (Def. Mot. Ex. 26 & 27.)  The Bender Accounts were unrestricted business checking accounts, and Bender had authority to transfer funds from them for any purpose without obtaining the authorization of Medilink or any other entity.  (Def. Mot. Ex. 26 & 27.)  The Bender Accounts were thus distinct from the Medilink Accounts in both ownership and type.  Bender also maintained with Comerica an account with terminal digits x0973 ("Carlisle Account") and an account with terminal digits x4520 ("Personal Account").  (Def. Mot. Ex. 26.)  In addition to maintaining these accounts with Comerica, Bender had obtained various loans from Comerica, secured in part by the Bender Accounts.  (Def. Mot. Ex. 27 §§ 1.58, 2.12, 2.14; Def. Mot. Ex. 30.)

In handling claims ultimately reinsured by Medilink, Bender acted as third-party claims administrator.  (Pl. Mot. Ex. 4 at 36.)  Upon resolution of a claim, Bender would submit a request for payment to Medilink.  (Pl. Mot. Ex. 4 at 71-72.)  Medilink would

2

then review the claim and determine whether to approve it.  (Pl. Mot. Ex. 4 at 72.)  If

approved, the claim would then go to a subsidiary of Marsh & McLennan Companies

("Marsh") for additional approval.  (Pl. Mot. Ex. 4 at 72-73.)  Marsh would then direct

Comerica to transfer funds from a Trust Account to a Bender Account.  (Pl. Mot. Ex. 4 at

73.)  At this point, Bender was expected to pay the funds over to the claimant or

claimants.  However, it is undisputed that on numerous occasions between 2005 and

2007, Bender had obtained funds for which there existed no legitimate claim; Bender

instead retained the funds for his personal and business use.  (Pl. Mot. Ex. 4 at 131-32.)

One such instance of inappropriately obtaining funds from the Trust Accounts is

at issue in this case.  It involves the false claim that ultimately led to the discovery of

Bender's fraud.  On August 21, 2007, Bender submitted a false claim to Medilink for

reimbursement of a claim payment to Louis Rahall.  (Def. Mot. Ex. 32.)  The request

was approved, and funds were transferred from a Trust Account to a Bender Account

on August 30, 2007.  (Def. Mot. Ex. 32.)  On August 31, 2007, Bender presented a

check in the amount of $318,048 for payment at a Comerica branch bank for deposit

into his Carlisle Account.  (Def. Mot. Ex. 37; Def. Mot. Ex. 7 at 11.)  The check issued

from Bender to Rahall and his attorney, Christopher Sciotti, was drawn on Bender

Account x1154, and was series number 2166 ("Rahall Check").  (Def. Mot. Ex. 39.)  The

Rahall Check had been endorsed on the back with the names "Louis Rahall and

Christopher Sciotti" in a hand sufficiently similar to Bender's to eventually lead to an

investigation.  (Def. Mot. Ex. 38; Def. Mot. Ex. 39.)  However, at that time, the check

appeared complete and properly endorsed.  (Def. Mot. Ex. 7 at 64-65; Def. Mot. Ex. 39.)

Immediately upon depositing the Rahall Check into the Carlisle Account, Bender issued

3

a check drawn on the Carlisle Account for $300,000 and payable to cash ("Carlisle Check"). (Def. Mot. Ex. 37.) Bender then deposited the Carlisle Check into his Personal Account. (Def. Mot. Ex. 37.) Bender was authorized to sign on the Bender Account, the Carlisle Account, and the Personal Account. (Def. Mot. Ex. 26.)

Noting that the endorsements on the Rahall check appeared to match the "very distinctive" handwriting of Bender, branch manager Todd Salo filed an internal suspicious activity form. (Def. Mot. Ex. 38.) When Christopher Curry, a fraud investigator at Comerica, investigated this report, other suspicious transactions were uncovered. (Def. Mot. Ex. 9 at 35-36.) On September 4, 2007, Comerica placed a pledge on the Bender Account on which the Rahall check was drawn (x4520) in order to protect itself should the check prove to be improperly paid. (Pl. Mot. Ex. 14 at # 2.) After further investigation, on September 10, 2007, Comerica exercised its discretionary power to freeze the three Bender Accounts, the Carlisle Account, and the Personal Account. (Pl. Mot. Ex. 14 at # 2; Def. Mot. Ex. 27 at § 3.05.) On the same day, Curry contacted Ruth Goodell, Comerica's contact at Marsh, with information regarding the suspicious activity of Bender. (Def. Mot. Ex. 9 at 77-78; Def. Mot. Ex. 18 at ¶ 10.) On September 11, 2007, Curry met with Goodell and Medilink chairman Gary Ley to investigate the suspicious activity, at which point Goodell and Ley verified that the funds transfers from the Trust Accounts to the Bender Accounts were validly authorized by Marsh and Medilink. (Def. Mot. Ex. 9 at 80-83; Pl. Mot. 5 at 98-101; Def. Mot. Ex. 28 at ¶¶ 5-6; Def. Mot. Ex. 32.)

As far as the parties dispute the material facts, the disagreement concerns only the events beginning with the September 11, 2007, meeting. Goodell states that her

4

understanding, based upon the discussions at that meeting, was that the funds would remain frozen if Marsh or Medilink notified the appropriate governmental agencies and merely provided notice to Comerica that the transactions were disputed.  (Pl. Mot. Ex. 5 at 144-45.)  In an e-mail message sent to Curry on September 12, 2007, Goodell declared that Medilink did dispute ten payments to Bender.  (Def. Mot. Ex. 43; Pl. Mot. Ex. 24.)  Goodell claims to have added specific language disputing the accounts at the direction of Curry, and she believed this notice would suffice to ensure the Bender Accounts remained frozen.  (Pl. Mot. Ex. 5 at 145; *compare* Pl. Mot. Ex. 23 *with* Pl. Mot. Ex. 24.)  On the same day, representatives of Comerica, Medilink, and Marsh conferred regarding the Bender activities.  (Goodell Dep., Def. Mot. Ex. 2 at 138; Peraino Dep., Def. Mot. Ex. 11 at 16-17, 26-27; Def. Mot. Ex. 42.)  Comerica's in-house counsel, Frank Peraino, asserts that he informed Medilink of the Michigan Adverse Claim Statute, Mich. Comp. Laws § 487.691, during that conference.  (Def. Mot. Ex. 11 at 43-44, 48-49.)  Medilink disputes this.  (Goodell Dep., Pl. Mot. Ex. 5 at 142-45.)  Following the meeting and Goodell's e-mail, it appears Medilink believed the Bender Accounts would be frozen indefinitely without further action.  (Ley Dep., Pl. Mot. Ex. 4 at 122-23, 152; Goodell Dep., Pl. Mot. Ex. 5 at 145-46.)

On September 13, 2007, Ley and Goodell met with Bender, who confessed to defrauding Medilink.  (Ley Dep., Pl. Mot. Ex. 4 at 130-132.)  Following the meeting, Medilink contacted the Federal Bureau of Investigation and the Department of Justice. (Goodell Dep., Def. Mot. Ex. 226-27.)  An investigation ensued, and a subpoena issued to Curry on October 3, 2007, for Comerica's records relating to Bender's bank transactions.  (Pl. Mot. Ex. 27.)  Ultimately, Bender was charged by information under

5

18 U.S.C. 2314, to which he pled guilty, and was ordered to pay restitution to Medilink in the amount of $3,619,765. *United States v. Bender*, No. 08-20465 (E.D. Mich. May 28, 2009). Medilink earlier brought a civil case against Bender and obtained judgment in the amount of $4,749,920. *Medilink Ins. Co. v. Bender*, No. 07-15019 (E.D. Mich. Mar. 5, 2007).

Prior to this, on October 1, 2007, Comerica declared Bender's loans in default for "certain conduct" impairing the prospect of repayment. (Def. Mot. Ex. 44.) Comerica simultaneously set off $382,812.37 against the Personal Account and another account of Bender. (Def. Mot. Exs. 45-46; Pl. Mot. Exs. 37-38.) The parties dispute the exact amounts and from which accounts the funds were set off. (Def. Mot. Facts ¶ 82; Pl. Resp. Facts ¶ 82.) Following the default, Bender and Comerica negotiated a forbearance agreement on October 19, 2007. (Def. Mot. Ex. 47.) As part of the forbearance, Bender opened a new account with terminal digits x7687 ("Cash Collateral Account"), which was to be frozen. (Def. Mot. Exs. 47-48.) The Collateral Account was funded with substantially all the funds in two of the three Bender Accounts (x7749 & x1154), totaling $350,000. (Ryan Dep., Def. Mot. Ex. 12 at 53; Def. Mot. Ex. 48; Pl. Mot. Ex. 41.) Comerica then unfroze all of Bender's accounts, with the exception of the Cash Collateral Account. (Def. Mot. Ex. 48.) Bender thereafter removed nearly all of the approximately $240,000 remaining in the third Bender Account (x7866). (Pl. Mot. Ex. 41; Def. Mot. Ex. 28 at ¶ 47.) Medilink asserts it was unaware of either the Cash Collateral Account or the removal of the restrictions on the Bender Accounts until some later point.

6

In November 2007, Medilink initiated a civil case against Bender.  On November 28, 2007, the court granted a TRO prohibiting all fund transfers from the Bender Accounts.  (Pl. Mot. Ex. 46.)  After learning that the Cash Collateral Account had been funded from two of the Bender Accounts prior to the TRO, Medilink filed a motion for a second TRO on December 31, 2007.  (Pl. Mot. Ex. 47.)  Before that motion was granted, Bender obtained access to the Cash Collateral Account, and withdrew substantially all funds therefrom on January 10, 2008.  (Dunleavy Report, Pl. Mot. Ex. 20 at Ex. M.).  On January 17, 2008, the court granted the second TRO, at which point little remained in the Cash Collateral Account.  (Pl. Mot. Ex. 48.)  The parties disagree as to how Bender obtained access to the Cash Collateral Account, but it is undisputed that the hold had not been properly placed on the account.  (Def. Mot. Ex. 49.)  As a result, Bender transferred funds from the Cash Collateral Account to one of his personal accounts, ultimately withdrawing the funds from that account.  (Def. Mot. Ex. 50.)

Medilink brought suit against Comerica in Wayne County Circuit Court, and Comerica timely removed the case to this court on September 19, 2009.  On November 12, 2009, Medilink filed an amended complaint, alleging statutory and common law conversion, the creation of a constructive trust, negligence, breach of fiduciary duty, and unjust enrichment.  In its answers on September 22, 2009, and November 27, 2009, Comerica asserted a counterclaim for fees based on the account agreements between Comerica and Medilink.  On September 27, 2010, both parties filed motions for summary judgment.[1]  Medilink seeks summary judgment on Comerica's counterclaim

---

[1]  On September 27, 2010, Comerica also filed a motion in limine, which will be denied as moot.

and partial summary judgment on Comerica's affirmative defenses and notice of non-party fault. Comerica seeks summary judgment on Medilink's claims and Comerica's counterclaim.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

8

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must put

forth enough evidence to show that there exists "a genuine issue for trial."  *Horton,* 369

F.3d at 909 (citing *Matsushita*, 475 U.S. at 587).  Summary judgment is not appropriate

when "the evidence presents a sufficient disagreement to require submission to a jury."

*Anderson*, 477 U.S. at 251-52.

The existence of a factual dispute alone does not, however, defeat a properly

supported motion for summary judgment—the disputed factual issue must be material.

*See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable

jurors could find by a preponderance of the evidence that the plaintiff is entitled to a

verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a

verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration

in original) (citation omitted)).  A fact is "material" for purposes of summary judgment

when proof of that fact would establish or refute an essential element of the claim or a

defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

1984) (citation omitted).

## III.  DISCUSSION

Medilink's complaint states six claims in law and equity cognizable under the

laws of the State of Michigan, and Comerica's sole counterclaim for indemnity and

breach of contract likewise arises under Michigan law.  Because jurisdiction in this case

is solely based upon diversity of citizenship, the court must apply the law of the State of

Michigan.  *Erie R.R. Co. v. Tomkins*, 304 U.S. 64 (1938); *Stalbosky v. Beleu*, 205 F.3d

890 (6th Cir. 2000).  As Comerica's counterclaim would also bar Medilink's claims

through the release, indemnity, and no recourse clauses of the Trust Agreements, the

9

court will consider it first.  Finding the counterclaim to be legally untenable, the court will then turn to Comerica's motion for summary judgment.  For the reasons stated below, the court will grant Comerica's motion for summary judgment.

### A.  Comerica's Counterclaim

Comerica's counterclaim against Medilink arises out of the exculpatory clauses in the Trust Agreements.  The terms of the provisions are unambiguous, so they must be given their plain meaning and enforced as written.  *See In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008); *Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 415 (Mich. Ct. App. 1997).  Both parties agree that the exculpatory provisions prohibit claims based upon the Trust Agreements, absent willful misconduct, negligence, or lack of good faith. (Def. Resp. Ex. 19, §§ 5.1, 5.5; Def. Resp. Ex. 20, §§ 5.1, 5.5.)  The only disagreement appears to be whether Medilink's claims implicate the Trust Agreements.

The language of the Trust Agreement provisions indicates that they bar actions "based on or arising out of any provision [of the Trust Agreements] or on or out of any of the instruments and agreements to be executed, delivered and performed [thereunder], as to all of which [the parties] agree to look solely to the Trust Estate."  (Def. Resp. Ex. 19, § 5.5; Def. Resp. Ex. 20, § 5.5.)  The Trust Agreements further require Medilink to indemnify Comerica against any liabilities or costs "arising out of or in connection with the performance of" Comerica's obligations under the Trust Agreements.  (Def. Resp. Ex. 19, § 5.5; Def. Resp. 20 § 5.7.)  Although ultimately without foundation, as discussed below, all of Medilink's claims avoid implicating the Trust Agreements.  The events and alleged duties arise not from the Trust Agreements, but rather from Comerica's dealings with Bender, contrary to Medilink's interests, after learning that

10

Bender obtained the funds by false pretenses.  Medilink proceeds on the theory that it retained ownership of the funds and that it sufficiently complied with the Adverse Claim Statute, both of which are addressed below.  Simply being incorrect about that is insufficient to impose liability for the counterclaim.  The pleadings indicate that Comerica is not asserting any claims based upon the Trust Agreements, and the court must enforce the indemnification provisions as written.  Medilink does not deny that the Trust Account transfers were authorized and the fund transfers proper.  (Def. Resp. Ex. 28 at ## 5-6.)  Nor does Medilink attempt to impose a general duty not to deal with Bender.  (*See* Def. Resp. Ex. 19 at § 4.2; Def. Resp. 20 at § 4.2.)  Aside from the claim of breach of fiduciary duty, no claim suggests any duty or obligation potentially based upon the Trust Agreements.

Medilink's claim for breach of fiduciary duty, however, presents a close question. Medilink has failed to provide any reasonable basis upon which to find that Comerica owed it any fiduciary duty.  As discussed further below, Medilink is unable to successfully pursue this claim.  A fiduciary duty must be based upon some fiduciary relationship.  *See In re Jennings' Estate*, 55 N.W.2d 812, 813 (Mich. 1952).  Although no reasonable basis for finding such a fiduciary relationship exists, Medilink has consistently disclaimed any assertion that Comerica stood in relation to Medilink as a fiduciary with regard to the Bender Accounts simply because of the separate fiduciary relationship between the parties concerning the Trust Accounts.  Indeed, Comerica itself asserts in its response that nothing in the Trust Agreements imposes upon it the duties Medilink alleges Comerica breached, including fiduciary duties.  (Def. Resp. 17-18.) Instead, Medilink unsuccessfully attempts to derive a fiduciary relationship from

11

Comerica's actions occurring on or after August 31, 2007, after Comerica became suspicious of Bender's deposit of the Rahall Check.

While Medilink's argument may be unavailing, Comerica has presented no basis upon which a reasonable jury could find that Medilink has violated the exculpatory provisions of the Trust Agreements. Although Medilink did refer to the "Comerica-Medilink contracts" in response to Comerica's request for documents pertaining to the alleged fiduciary relationship, this response was only one entry in an extensive list. (Def. Resp. Ex. 23 at # 41.) Medilink has since elaborated upon its position that the preexisting relationship between the parties provided Comerica with constructive knowledge of the purpose of the transfers to the Bender Accounts. (Def. Resp. Ex. 28 at # 38.) From this constructive knowledge, Medilink attempts to assert an ownership interest in the funds placed in the Bender Accounts, which it argues were trust accounts. Finally, Medilink argues that Comerica owed it a fiduciary duty as the owner of the funds in the Bender Accounts because they are trust accounts. Though its argument may be Byzantine and convoluted, Medilink has consistently adhered to it. Lacking sufficient evidence to support a reasoned finding that Medilink has attempted to base its claim upon the Trust Agreements, Comerica's counterclaim cannot survive. Therefore, Medilink's motion for summary judgment on Comerica's counterclaim will be granted.

**B.  Ownership of the Funds**

12

As a first preliminary matter affecting all of Medilink's claims, the court must determine the ownership of the funds in the Bender Accounts. For the reasons stated more fully below, Medilink had no title or other legal interest in the funds in the Bender Accounts. The court need not reach the issue of whether Medilink had any interest in the funds in the Trust Accounts. As Medilink had no legally cognizable interest in the funds in the Bender Accounts, Medilink likewise had no property interest in the funds after they left the Bender Accounts.

The analysis must necessarily begin with the ownership of the Bender Accounts. A deposit account is prima facie owned by the person or entity in whose name the account exists. *Muskegon Lumber & Fuel Co. v, Johnson*, 62 N.W.2d 619, 622 (Mich. 1954). Despite the intent of the depositor, funds deposited in a general account remain general credits of the account owner, unless the depositor has expressly created a trust. *Portage Aluminum Co. v. Kentwood Nat. Bank*, 307 N.W.2d 761, 764 (Mich. Ct. App. 1981). "A trust cannot be implied unless the understanding was that the money deposited for a specific purpose was not to be mingled [with other money of the bank]." *Id.* The instant case evinces no such intent to create a trust. The funds were released from the Trust Accounts to the Bender Accounts, which were unrestricted general deposit accounts. (Def. Mot. Ex. 27.) Only Bender was listed as the owner of the accounts in the account contracts, and only John P. Bender and Karen Leslie, an employee of Bender, were signatories on the accounts. (Def. Mot. Ex. 26; Def. Mot. Ex. 27 at § 1.48.) Medilink has not presented any evidence that the accounts were other than wholly owned by Bender. Therefore, it is reasonable to infer that Bender was the sole owner of the Bender Accounts.

13

Even so, Bender had only a contractual right to repayment of the funds deposited into the accounts.  It is well established under Michigan law that title to funds in a general deposit account resides with the bank, and the account owner retains "only an entitlement to recoupment of an equivalent sum upon demand, having loaned the bank the amount deposited."  *Riverview Co-op, Inc. v. First Nat. Bank & Trust Co. of Michigan*, 337 N.W.2d 225, 229 (Mich. 1983).  A general deposit account results in the commingling of currency and anticipates repayment of only an equivalent sum, rather than the identical currency deposited; as a result of which, the account owner stands as a creditor and the bank as a debtor.  *Owosso Masonic Temple Ass'n v. State Savings Bank*, 263 N.W. 771, 774 (Mich. 1935).  "The title to the money constituting a general deposit does pass to the bank."  *Id.*  As the Bender Accounts were general deposit accounts, title passed to Comerica when funds from the Trust Accounts were deposited into the Bender Accounts.  Comerica then owed a contractual obligation to Bender, as the account owner.  Regardless of any rights it may have enjoyed as trustor or depositor of the Trust Accounts, Medilink retained no further rights in the funds once they passed to the Bender Accounts.

To the preceding, Medilink counters that Bender could not have obtained title to the funds because of his unlawful means of acquiring them, and, therefore, he could not have passed title to Comerica.  It is, indeed, an age-honored maxim of the common law that a thief cannot convey good title.  However, this applies only where, and only because, a thief himself does not take title to the property, and one cannot pass that which one does not have.  *In re Newpower*, 233 F.3d 922, 930 (6th Cir. 2000).  Here the means by which Bender defrauded Medilink becomes significant.  By submitting

14

fraudulent claims and receiving funds with Medilink's authorization, Bender obtained both possession and title through false pretenses. "[T]he critical difference between larceny crimes and false pretense crimes is the passage of title." *Id.* at 929 (citing *People v. Malach*, 507 N.W.2d 834, 837 (Mich. Ct. App. 1993)). Where the owner of property intends to transfer title along with possession, albeit based upon a mistake of fact brought about by the fraud of the recipient, the recipient acquires the property by false pretenses. *Id.* One who takes by false pretenses does obtain good title to the property, and he can pass good title to an innocent third party. *Id.*

Regardless of whether Medilink had any interest in the funds in the Trust Accounts, the undisputed facts are susceptible of only one conclusion regarding intent to transfer title. First, the Trust Agreements provide for the transfer of title free and clear of any Trust Account assets by "[a]ny sale or other conveyance." (Def. Rep. Ex. 19 at § 7.2, Ex. 20 at § 7.2.) The unambiguous text of the agreement provides that any such disposition "shall be effective to transfer or convey all right, title and interest . . . in and to such Trust Assets." (Def. Rep. Ex. 19 at § 7.2, Ex. 20 at § 7.2.) Second, the transfer of funds to an unrestricted account owned exclusively by Bender, and over which Medilink maintained no control, further evinces an intent to pass title to the funds.

Medilink has presented no evidence to support a finding that Comerica had either knowledge or notice of Bender's actions prior to deposit of the funds in the Bender Accounts. The earliest Comerica could be found by a jury to have had notice would have been after the Rahall Check had been deposited on August 31, 2007. Upon review of the Rahall Check after acceptance, Comerica admits it became suspicious of Bender's activities, and it was at this point that Comerica initiated an investigation of

15

Bender's activities.  Medilink, likewise, does not contend that Comerica had actual knowledge, or even a reasonable suspicion, of Bender's fraud prior to deposit of the Rahall Check on August 31, 2007.  By that point, however, the payment from the Trust Accounts to the Bender Accounts was final under UCC § 4A-406.  Mich. Comp. Laws § 440.4906(1).  Comerica had by then acquired both title to the currency and a perfected senior security interest in the account funds.  *See* Mich. Comp. Laws §§ 440.9104(a), 440.9314(1)-(2); *Owosso Masonic Temple Ass'n*, 263 N.W. at 774.  Subsequent discovery of Bender's fraud came too late to divest Comerica of legal rights already established.  Therefore, Comerica held title to the funds in the Bender Accounts; Bender had contractual rights to repayment of funds of equivalent value; and Medilink had no legal interest in the Bender Accounts or the funds therein.

## C.  Adverse Claim Statute

As a second preliminary matter affecting multiple claims, the court now turns to the effect of the Adverse Claim Statute, Mich. Comp. Laws § 487.691.  The statute specifies certain procedures adverse claimants to funds in deposit accounts must follow before banks are required to recognize their claims.  In relevant part, the Adverse Claim Statute provides:

> Notice to any bank . . . of an adverse claim to a deposit standing on its books . . . shall not be effectual to cause said bank to recognize said averse claimant unless said adverse claimant shall also either procure a restraining order, injunction or other appropriate process against said bank from a court of competent jurisdiction . . . or shall execute to said bank, in form and with sureties acceptable to it a bond, indemnifying said bank from any and all liability, loss, damage, costs and expenses for and on account of the payment of such adverse claim . . . .

16

Mich. Comp. Laws § 487.691.  Only two means of establishing an adverse claim that a bank is required to recognize are generally permitted: 1) procuring an appropriate court order recognizing a potential claim to the funds, or 2) providing satisfactory indemnification and a bond to the bank.  Aside from two TROs issued by the court on November 28, 2007, and January 17, 2008, the parties acknowledge that neither of these specific requirements were met.  Nonetheless, Medilink argues that the statute should not bar recovery because Comerica knew of Bender's suspicious activities.

No published opinion of the Michigan courts has directly addressed compliance with the requirements of the Adverse Claim statute.  The cases presented by Medilink stand simply for the proposition that the later determination that an injunction was not properly issued is irrelevant for purposes of providing notice.  *DeKuyper v. DeKuyper*, 113 N.W.2d 804 (Mich. 1962)*; Owen v. Birminham Fed. Savings and Loan Assoc.*, 183 N.W.2d 403, 410-11 (Mich. Ct. App. 1971).  The cases do not indicate that informal notice should be given the same force as an injunction, as Medilink contends.  There yet remains a world of difference between the notice provided by court order and the unsworn assertions of a private individual.

Lacking published cases on point, the court finds the unpublished opinion in *Mid Am Credit Corporation v. Joint Military & Veterans Credit Union*, No. 216508, 2001 WL 1422147 (Mich. Ct. App. 2001), closely analogous to the instant case, and its analysis of the Adverse Claim Statute is persuasive.  Although the *Mid Am* court did not apply the statute because the defendant in that case was a credit union, it found that no duty was owed by the defendant where the plaintiff had provided "mere verbal notification." *Id.* at *5-6.  This court is in agreement with the *Mid Am* court; the Adverse Claim Statute

17

"clearly requires a claimant to obtain an injunction or similar court process to pursue a claim against funds deposited in another party's account." *Id.* at *5. Indeed, this reading is the only interpretation allowed under the plain text of the statute. In interpreting a statute, the court must give effect to the intent of the legislature. *Sun Valley Foods Co. v. Ward*, 596 N.W.2d 119, 123 (Mich. 1999). The plain language of the statute itself provides "the most reliable evidence of its intent." *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 593 (1981)). Where the statutory language is clear and unambiguous, no interpretation is necessary, and "the statute must be enforced as written." *Id.* at 123. This court agrees with the court in *Mid Am* that the language of § 487.691 establishes an unambiguous procedure for adverse claimants to protect their interests. Therefore, failure to comply with the statutorily proscribed requirements of the Adverse Claim Statute precludes the imposition of any duty upon a bank to recognize any interests of adverse claimants in a deposit account.

This requirement of compliance with the unambiguous language of the statute applies equally to notice under the fiduciary exception to the Adverse Claim Statute:

> Provided, That this law shall not apply in any instance where the person to whose credit the deposit stands is a fiduciary for such adverse claimant, and the facts constituting such relationship, as also the facts showing reasonable cause of belief on the part of the said claimant that the said fiduciary is about to misappropriate said deposit, are made to appear by the affidavit of such claimant.

Mich. Comp. Laws § 487.691. The statute lowers the hurdle for adverse claims to funds held in accounts of fiduciaries, but it does not excuse such claimants from compliance altogether. Although a mere affidavit suffices where the funds claimed are held in the account of a fiduciary, the adverse claimant must comply with at least this requirement.

18

"Under Michigan law, a fiduciary relationship will arise 'only when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another.'"  *Rose v. Nat. Auction Group, Inc.*, 646 N.W.2d 455, 466 (Mich. 2002) (quoting *In re Jennings' Estate*, 55 N.W.2d 812, 813 (Mich. 1952)).  Whether Bender was a fiduciary of Medilink is a question of fact that should be determined by a jury *if* it were necessary to the disposition of this case, but it is not.  *See Taylor v. Klahm*, 198 N.W.2d 715, 720-21 (Mich. Ct. App. 1972).  Even had Bender been a fiduciary of Medilink, it is undisputed that Medilink never provided Comerica with any affidavit averring 1) the fiduciary relationship and 2) reasonable grounds upon which to freeze or limit withdrawals from the accounts.  An affidavit consists of a written statement of facts, voluntarily made, and "confirmed by the oath or affirmation of the party making it."  *Detroit Leasing Co. v. City of Detroit*, 713 N.W.2d 269, 272 (Mich. Ct. App. 2005) (quoting *Holmes v. Michigan Capital Medical Center*, 620 N.W.2d 319 (Mich. Ct. App. 2000)).  Goodell's verbal notification and electronic mail message that Medilink "is disputing the following payments" do not constitute an affidavit.  (Pl. Mot. Ex. 23.) Even Comerica's actual knowledge is irrelevant where the statutory language establishes clear requisites to liability.

Having thus failed to comply with the unambiguous terms of the Adverse Claim Statute until obtaining the TROs, Medilink cannot now hold Comerica liable for refusing to recognize Medilink's adverse claims prior to or in addition to the TROs.  Medilink correctly states that it did—eventually—comply with the statute by obtaining a TRO on November 28, 2007, freezing the Bender Accounts.  Thus, the Adverse Claim Statute would provide no protection to Comerica for releasing funds from those specific

19

accounts after that date.  Similarly, the January 17, 2008, TRO effected statutory

compliance with respect to the funds in the Cash Collateral Account as of January 17,

2008.  The parties do not dispute that Comerica has kept these accounts frozen since

these TROs issued.  The bank was not required to do more, nor do it earlier, than

required by these orders of the court.

### D.  Common Law Conversion

Conversion under Michigan law consists of a "distinct act of domain wrongfully

exerted over another's personal property in denial of or inconsistent with the rights

therein."  *Dept. of Agriculture v. Appletree Marketing, LLC*, 779 N.W.2d 237, 244 (Mich.

2010) (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich.

1992)).  From this definition, one cannot convert his own property.  *Foremost*, 486

N.W.2d at 606; *see also AFSCME v. Bank One*, 705 N.W.2d 355, 360 (Mich. Ct. App.

2005) (discussing importance of title).  As discussed above, Comerica was titular owner

of the funds once deposited, owning only contractual duties to repay Bender.  Medilink

retained no interest or right in the property or the Bender Accounts.  Therefore,

Comerica is not liable to Medilink for conversion under Michigan law.

Furthermore, Comerica could not be held liable for conversion because currency

deposited into a general account can never be the subject of a successful conversion

action.  Medilink acknowledges that "[a]n action for the conversion of bank account

funds . . . can be maintained only if there was an obligation on the defendant's part to

return or deliver the *specific* money entrusted to it."  *Check Reporting Services, Inc. v.*

*Michigan Nat. Bank-Lansing,* 478 N.W.2d 893, 900 (Mich. Ct. App. 1991) (emphasis

added) (quoted in Pl. Resp. 26-27).  Any alleged obligation of Bender "to spend

20

Medilink's money to pay specifically approved claims" bears as much relation to any alleged obligation of Comerica to return specific currency to Bender as it bears to this court's duty to decide specific motions filed by specific parties in specific cases.  (Pl. Resp. 27.)  As discussed above, the Bender Accounts were not trust accounts, and the currency deposited became property of the bank when it was commingled with other deposits.  Therefore, the funds are not subject to a conversion claim because Comerica had only an obligation to return an equivalent sum and deliver currency of equivalent nominal value.

### E.  Statutory Conversion

Statutory conversion is, as the name implies, a creature of statute, imposing liability for certain wrongful acts relating to "stolen, embezzled, or converted property." Mich. Comp. Laws § 600.2919a.  Unlike common law conversion, statutory conversion extends liability to those dealing in stolen property.  It also requires actual knowledge of the underlying conversion, embezzlement, or theft before liability attaches.  *Echelon Homes, L.L.C. v. Carter Lumber, Co.*, 694 N.W.2d 544, 549 (Mich. 2005).  In relevant part, the statute provides:

> A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> *   *   *
>
> (b)  Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

21

Mich. Comp. Laws § 600.2919a(1).  Just as the statute requires actual knowledge, the plain language limits its application to "stolen, embezzled, or converted property."  Mich. Comp. Laws § 600.2919a(1).  As discussed above, the funds in the Bender Accounts were neither converted nor embezzled; they were obtained under false pretenses. Neither party has presented, nor has the court discovered, any case directly addressing whether funds obtained by false pretenses are "stolen" for purposes of statutory conversion.  Fortunately, the court need not reach that issue.

Should the court read *In re Newpower*, 233 F.2d 922, 929-30 (6th Cir. 2000), as indicating that funds obtained through false pretenses are not "stolen property," Medilink's statutory conversion claim would necessarily fail.  Such an interpretation of the statute would limit "stolen property" to that property of which the thief obtains only possession, as by larceny, embezzlement, or conversion.  Each of these offenses involve the wrongful taking of possession without the taking of title.  *Id.*  As such, the owner from whom property is stolen retains an interest in the property.

An interpretation that funds obtained by false pretenses are not "stolen property" would not be unreasonable in light of the interpretation of similar language in the Michigan statute governing receipt of stolen property, Mich. Comp. Laws § 750.535. *See People v. Pratt*, 656 N.W.2d 866, 868-69 (Mich. Ct. App. 2002).  Interpreting the term "stolen" in that statute, the *Pratt* court found that "[f]or goods to be considered stolen under this definition, they need only be taken without permission or right."  *Id.* at 869.  Additionally, Black's Law Dictionary defines "stolen property" as "goods acquired by larceny, robbery, or theft."  Black's Law Dictionary 1555 (9th ed. 2009).  The definition of "theft" may be so narrow as to encompass only larceny or broad enough to

22

contain false pretenses. *Id.* at 1615. From these sources, the court could find that property taken under false pretenses is not stolen. Under such an interpretation, false pretenses cannot form the basis of liability for statutory conversion.

Should the court instead read "stolen property" as including funds obtained by false pretenses, however, Medilink's statutory conversion claim under § 600.2919a would fail nonetheless. This interpretation, too, would not be unreasonable in light of *Lake v. United States*, 338 F.2d 787 (10th Cir. 1964), which held that a motor vehicle was "stolen" within the meaning of the National Motor Vehicle Theft Act where title and possession were obtained by a false promise to repay existing loans secured by the vehicle. The *Lake* court expressly included false pretenses in a list of theft offenses involving "stolen" property. *Id.* at 789. Again looking to the *Pratt* court's interpretation of "stolen" as referring to property "taken without permission or right," the holding does not foreclose the inclusion of property obtained by false pretenses. 656 N.W.2d at 869. Indeed, the *Pratt* court held that "stolen property" encompasses more than property acquired through larceny. *Id.* at 868.

Even assuming that money acquired by false pretenses can constitute "stolen property", Medilink has provided no evidence to allow a reasonable jury to find that Comerica knew it to be such when it acquired title. Statutory conversion requires actual knowledge at the time of the "buying, receiving, possessing, concealing, or aiding in the concealment" of the stolen property. *Echelon Homes*, 694 N.W.2d at 547. Mere suspicion or constructive knowledge will not suffice. *Id.* at 547-58. Under the facts presented by Medilink, the strongest inference that may reasonably be drawn regarding Comerica's knowledge at the time it deposited the Rahall Check on August 31, 2007, is

23

constructive notice.  There is nothing in the record to indicate any level of knowledge or notice at the time the funds were transferred into the Bender Accounts.  Comerica had title to the funds prior to gaining actual knowledge.

The court need not speculate as to when a reasonable jury could determine Comerica first acquired actual knowledge, as no reasonable inference would support finding that Comerica actually knew that the funds were "stolen"—even under a less rigorous definition of the concept—when the funds were deposited into the Bender Accounts.  Having acquired the funds from the Trust Accounts without knowledge of Bender's false pretenses and with valid authorization, Comerica obtained ownership of the funds as discussed above.  Comerica also obtained automatic perfection of a security interest in the Bender Accounts and the Personal Account, pursuant to UCC §§ 9-104 and 9-314.  Mich. Comp. Laws §§ 440.9104(a) & 440.9314(1)-(2).  Comerica merely exercised its right to set off funds in the Bender Accounts against Bender's debts at a later time, at which point it may have had actual knowledge of Bender's false pretenses.  *See* Mich. Comp. Laws § 440.9607(1)(d).  As Comerica obtained title to the funds without knowledge, its subsequent set off against the Bender Accounts and release of the funds to the Cash Collateral Account likewise did not result in statutory conversion, even if it had actual knowledge by such time.  *See Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1277 (11th Cir. 2003).

Regardless of whether the funds were "stolen property" under § 600.2919a, Medilink has not presented sufficient evidence to permit a reasonable jury to find Comerica liable for statutory conversion.  Comerica's motion for summary judgment on Medilink's statutory conversion claim must be granted.

24

## F. Negligence

Under Michigan law, negligence comprises four elements: 1) duty, 2) breach of duty, 3) causation, and 4) injury.  *Bialick v. Megan Mary, Inc.*, 780 N.W.2d 599, 602 (Mich. Ct. App. 2009) (citing *Case v. Consumers Power Co.*, 615 N.W.2d 17 (Mich. 2000)).  The existence of a duty upon which Plaintiff may base its negligence action must be determined as a matter of law.  *Friedman v. Dozorc*, 312 N.W.2d 585, 591 (Mich. 1981).  Michigan courts look to a number of factors in determining whether a duty exists, including:

> foreseeability of the harm, existence of a relationship between the parties involved, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach.

*Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727, 730 (Mich. Ct. App. 1996).  A legal relationship between the parties and foreseeability of the harm are necessary, though insufficient, for the court to find the existence of a duty.  *In re Certified Question 14th Dist. Ct. Tex.*, 740 N.W.2d 206, 213 (Mich. 2007).  In the instant case, Comerica owed no duty to protect Medilink, absent compliance with the Adverse Claim Statute.

As a general rule, "banks have no duty to pry into the affairs of their depositors in order to protect third parties."  *Blair v. Trafco Prods., Inc.*, 369 N.W.2d 900, 903 (Mich. 1985).  The Adverse Claim Statute goes further by negating the possibility of a duty to recognize (and, therefore, a duty to protect) the rights of adverse claimants of bank deposits, unless and until certain statutory requirements are met.  Mich. Comp. Laws § 487.691.  As discussed above, Medilink failed to assert a valid adverse claim pursuant to statute.  Therefore, Comerica had no duty to recognize any third-party claims by

25

Medilink adverse to the interests of Bender—the account owner and presumed owner of the funds deposited into the account.

Nor does Comerica's action of placing a temporary hold on the accounts create liability where there had otherwise been none. The court in *Mid Am Credit Corporation* expressly rejected a negligence claim against a financial institution for its error in implementing a stop payment order where the institution agreed to stop payment without being under a legal obligation to do so, but where the error rendered the stop payment order ineffective. 2001 WL 1422147, at *6. In some instances, the undertaking of a gratuitous service to another may require the use of due care to avoid leaving the other party in a worse condition. *Id.* (citing *Lindsley v. Burke*, 474 N.W.2d 158, 160-61 (Mich. Ct. App. 1991)). However, this is not such a case. When Comerica instituted temporary holds on the Bender Accounts and later released them, it left Medilink in no worse position than had it never frozen the accounts. Instead, Medilink had the benefit of several weeks of additional time to assert a proper adverse claim, which it did not do.

No duty to protect the funds for the benefit of Medilink existed before Comerica implemented the temporary freezes, and no duty to maintain those freezes arose simply because it did so. Therefore, Medilink cannot maintain an action in negligence against Comerica based upon the facts presented.

## G. Breach of Fiduciary Duty

A breach of fiduciary duties necessarily implies the existence of a fiduciary relationship from which such duties attach. *See In re Jennings' Estate*, 55 N.W.2d 812, 813 (Mich. 1952). The existence of fiduciary duties is a question of law to be decided

by the court.  *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 698
N.W.2d 900, 906 (Mich. Ct. App. 2005) (citing *Harts v. Farmers Ins. Exch.*, 597 N.W.2d
47, 50 (Mich. 1999)).  As explained in Part III.A., above, "[a] fiduciary relationship exists
when there is a reposing of faith, confidence and trust and the placing of reliance by one
upon the judgment and advice of another."  *Smith v. Saginaw Savings & Loan
Association*, 288 N.W.2d 613, 618 (Mich. Ct. App. 1979) (citing *Williams v. Griffin*, 192
N.W.2d 283 (Mich. Ct. App. 1971) (citing *In re Jennings' Estate*, 55 N.W.2d at 813)).
However, trust and reliance must be reposed in the fiduciary based upon reasonable
grounds.  *Rose v. National Auction Grp., Inc.,* 646 N.W.2d 455, 469 (Mich. 2002); *Beaty
v. Hertzberg & Golden, P.C.*, 571 N.W.2d 716, 722 (Mich. 1997); *Prentis*, 698 N.W.2d at
906.  It is presumptively unreasonable to repose trust in one whose interests are, or
may be, adverse.  *Beaty*, 571 N.W.2d at 722; *Prentis*, 698 N.W.2d at 906.  For this
reason, Michigan courts have consistently rejected the imposition of fiduciary duties on
banks without more than a mere debtor-creditor relationship, even where the creditor
has offered advice.  *Ulrich v. Fed. Land Bank of St. Paul*, 480 N.W.2d 910, 911 (Mich.
Ct. App. 1991); *Farm Credit Services of Michigan's Heartland, P.C.A. v. Weldon*, 591
N.W.2d 438, 447 (Mich. Ct. App. 1998); *Smith*, 288 N.W.2d at 618 (finding duty where
the parties' "relationship was not the general one existing between a bank and its
depositors"); *Portage Aluminum Co. v. Kentwood Nat. Bank*, 307 N.W.2d 761, 763-64
(Mich. Ct. App. 1981).

        Medilink has presented no case in which a fiduciary relationship has been so
lightly foisted upon a defendant who had not undertaken some position of responsibility
or agency for the benefit of the plaintiff.  The court agrees with the *In re Jennings'*

*Estate* court that "the term should be held to mean what the word 'fiduciary' implies and that the relationship exists only when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another." 55 N.W.2d at 813. The court in *Boden v. Renihan* more clearly stated the requirement that "the trust or confidence is *accepted* under circumstances which show that it was founded on intimate personal and business relations existing between the parties." 300 N.W. 53, 58 (Mich. 1941) (citation omitted) (emphasis added). Similarly, the court in *Ulrich v. Federal Land Bank of St. Paul* compared ordinary borrower-lender relationship in that case with the "active involvement" of the bank manager in *Smith v. Saginaw Savings & Loan Association*, determining that the mere inexperience of the plaintiff or the advertised expertise of the defendant had not established a fiduciary duty. 480 N.W.2d 911. Fiduciary duties are not imposed by an unfounded hope that another party act for one's benefit; they must be founded upon a fiduciary relationship giving rise to a reasonable expectation that a party will undertake a binding legal obligation to act for the benefit of another.

As discussed above, Medilink has disclaimed fiduciary duties based upon the Trust Agreements. This admission has far-reaching implications for Medilink's breach of fiduciary duty claim. Without invoking the Trust Agreements, Medilink cannot rely upon any fiduciary relationship relating to or arising out of Comerica's handling of the Trust Accounts. Furthermore, any fiduciary duties Comerica owed Medilink or other parties relating to the Trust Accounts were fulfilled when it properly transferred the funds to the Bender Accounts as authorized. Medilink's relationship with Comerica regarding

28

the Trust Accounts must be contrasted against Medilink's lack of a relationship with Comerica regarding the Bender Accounts.

To clarify this distinction, Comerica could have owed a fiduciary duty to warn of known insolvency or fraud by Bender before transferring funds out of the Trust Accounts, based upon the Trust Agreements or Comerica's position with respect to the Trust Accounts.  This would be akin to the situation in *Smith v. Saginaw Savings & Loan Association*, 288 N.W.2d 613, in which a bank manager served as agent for a distant customer by overseeing a construction project and disbursing funds from the customer's account for progress payments as work was completed.  *Id.* at 615.  After discovering that the builder was experiencing severe financial problems, which eventually led to bankruptcy, the banker failed to warn the customer and disbursed funds for work not completed.  *Id.* at 618.  The *Smith* court found that the "reposing of faith, confidence and trust" in that case was sufficient to establish a fiduciary relationship and that the abuse of that trust constituted a breach of fiduciary duties.  *Id.* at 618.  Such is not the case, however, with respect to Comerica's actions relative to Medilink regarding the Bender Accounts and funds withdrawn therefrom.  Comerica did not undertake any special obligations to Medilink regarding the Bender Accounts.  In fact, Medilink had no legal interest in the Bender Accounts at all, as discussed above.  Comerica's early warning to Medilink after investigating the Rahall Check appears to be the first communication between the parties regarding the Bender Accounts.  Medilink and Comerica lacked even the ordinary borrower-lender relationship with respect to the Bender Accounts, let alone a fiduciary relationship.

29

From the preceding, it is apparent that Medilink's proposed fiduciary relationship with Comerica cannot be based upon any general relationship between the parties, nor can it be based upon the longstanding relationship involving the Trust Accounts. After extensive briefing and hearing, Medilink appears to ground its assertion of the existence of fiduciary duties upon nothing more than Comerica's actions in informing Medilink of suspicious activity, continued communication following the notification, the placement of temporary holds on the Bender Accounts, and a subjective belief that Comerica would act to protect Medilink's interests. Notably absent from this list is any action by Comerica indicating that it would act for Medilink's benefit that would make it reasonable for Medilink to repose trust and confidence in Comerica despite the parties' interests being adverse. The rule Medilink asks the court to adopt would allow the unilateral imposition of fiduciary duties—among the most encompassing and stringent class of general duties recognized by law. Were the uninvited (and unreasonable) reposing of trust in the actions of others the sole requirement to create a fiduciary relationship, many a professional athlete could be called to answer for lackluster performance to crowds of disappointed gamblers. To apply such a rule in the instant case would mark "too radical a departure from well-established, traditional banking laws." *Portage Aluminum*, 307 N.W.2d at 764. Therefore, Medilink's claim for breach of fiduciary duty must fail as a matter of law.

### H.  Equitable Claims — Unjust Enrichment and Constructive Trust

The court finally considers Medilink's equitable claims. At the outset, it is important to note that a constructive trust is a remedy available to courts sitting in equity, which may be imposed upon a defendant "where such trust is necessary to do

equity or to prevent injustice." *Ooley v. Collins*, 73 N.W.2d 464, 469 (Mich. 1955).  This remedy may be granted to impose a trust upon some identifiable property when title to property "has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property." *Kammer Asphalt Paving Co., Inc. v. East China Twp.*, 504 N.W.2d 635, 641 (Mich. 1993) (quoting *Potter v. Lindsay*, 60 N.W.2d 133, 136 (Mich. 1953) (quoting *Racho v. Beach*, 236 N.W. 875, 877 (Mich. 1931))).  "A constructive trust may be based upon a breach of fiduciary or confidential relationship, misrepresentation, concealment, mistake, undue influence, duress or fraud." *Id.* at 641 n.28 (quoting *Grasman v. Jelsema*, 246 N.W.2d 322, 326 (Mich. Ct. App. 1976)).  In the instant case, the injustice alleged to support the constructive trust remedy is the same as that alleged to support the claim for unjust enrichment.  As the court finds that there is no genuine issue of material fact and that Comerica obtained no inequitable benefit, the two equitable claims will be considered together.

Unjust enrichment under Michigan law comprises "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003); *accord Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1993).  There can be no doubt but that an unjust enrichment claim requires the enrichment of some defendant.  Likewise, a constructive trust cannot be imposed where there is no long a *res* to be held in trust—where Comerica has not retained the funds for its own benefit.  *See EBSCO Indust., Inc. v. Lilly*, 840 F.2d 333, 338 (6th Cir. 1988).

31

Comerica did not, however, receive a benefit from the following funds: those funds remaining in the Bender Accounts following the TRO of November 28, 2007, those funds remaining in the Cash Collateral Account following the TRO of January 17, 2008, and those funds removed by Bender from the Cash Collateral Account on January 10, 2008. There is no indication that these funds ever benefitted Comerica, and they may be recovered by Medilink in due course from Bender. The only funds from which Comerica received a benefit, potentially at the expense of Medilink, are the funds against which Bender's indebtedness to Comerica was off set on October 1, 2007. Medilink's equitable claims, therefore, turn on whether Comerica's retention of the funds set off from the Bender Accounts on October 1, 2007, would work an injustice or inequity.

Comerica asserts in its motion that it was not unjustly enriched by the set off of part of the debt owed to it by Bender, as permitted under UCC § 9-607. Medilink argues in response that "Medilink's equities are clearly superior to those of Comerica" because Bender defrauded it into releasing the funds to him. (Pl. Resp. Br. at 55.) Whether Medilink would have a stronger equitable claim to the funds than would Comerica, *ceteris paribus*, is irrelevant. To prevail upon its claim, Medilink must be able ultimately to show that it would be unjust to allow Comerica to retain funds it set off against a preexisting debt from the account of a nonparty shortly after discovering the nonparty was in breach of covenants in a loan agreement.

As discussed above, Comerica had legitimate interests adverse to those of Medilink, owed Medilink no duty to act for its benefit, and had already become the owner of the funds by the time it discovered Bender's fraud. Furthermore, to protect its

interest in the funds in the Bender Accounts Medilink had an adequate remedy at law—the Adverse Claim Statute—which it failed to pursue. This alone might bar any resort to equity under Michigan law, but neither party has presented any case indicating that failure to comply with the Adverse Claim Statute must necessarily cut off all equitable claims where no other remedy at law exists. *See Wild v. Wild*, 103 N.W.2d 607, 610 (Mich. 1960) (equitable remedies remain viable where legal remedies are "doubtful, incomplete or otherwise inadequate"); *Everett v. Nickola*, 599 N.W.2d 732, 735 (Mich. Ct. App. 1999) (resort to equity "is neither necessary nor appropriate where a resolution under the law is available"). The parties also do not dispute that Comerica discovered Bender's activities and promptly informed Medilink and Marsh, both of which were represented by counsel.

Comerica had a contractual and statutory right to set off the funds in Bender's accounts, which secured his preexisting debt. Under UCC §§ 9-104, 9-314, and 9-607, Comerica had a perfected security interest in the funds as soon as they were placed in the Bender Accounts and the right to set off these funds upon Bender's default. Mich. Comp. Laws §§ 440.9104(a), 440.9314(1)-(2), 440.9607(1)(d); (Def. Mot. Ex. 27, Account Contract, at § 2.14); (Def. Mot. Ex. 23, Loan Documents). Where a defendant merely exercises a right to obtain some lawful benefit, it generally is not unjustly enriched. *See Dumas*, 473 N.W.2d at 663. Indeed, where one creditor obtains repayment ahead of another creditor through lawful means and in the ordinary course of business, it obtains no inequitable benefit. *Comerica Bank v. Suburban Trust & Savings Bank*, 1996 WL 585888 (6th Cir. 1996); *accord United States v. Goforth*, 465 F.3d 730, 734 (6th Cir. 2006). The courts have recognized that competition in the marketplace

33

between creditors for limited assets of a debtor need be neither unhealthy nor unjust. *Id.*

Viewing all facts in the light most favorable to Medilink, as the non-moving party, the most than can be said is that Comerica zealously defended its own interests by availing itself of its rights as a depository institution creditor of Bender.  Indeed, Medilink had every opportunity to assert an adverse claim to the funds because Comerica gave it that opportunity by informing it of Bender's activities and holding a meeting on September 11, 2007.  That a victim of a financial crime may be a more sympathetic party than an undersecured lender will not support the imposition of an equitable remedy where no fundamental injustice or inequity lies.  Therefore, Medilink's claims for unjust enrichment and constructive trust must fail.


**IV.  CONCLUSION**

As discussed above, there remains no genuine issue of material fact regarding either Medilink's claim or Comerica's counterclaim.  Viewed in the light most favorable to Comerica, the counterclaim must fail as a matter of law because Medilink has not sued Comerica under the terms of or in violation of the Trust Agreements.  Viewed in the light most favorable to Medilink, the complaint must fail because Medilink is not entitled to relief under any of the claims presented in law or equity.  As no claims will remain in the above-captioned matter, the court will issue a judgment following this opinion and order.  Accordingly,

IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 36] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment [Dkt. # 33] is GRANTED IN PART.  It is GRANTED IN PART with respect to Defendant's counterclaim.  The remainder of Plaintiff's motion for summary judgment is DENIED IN PART AS MOOT.

IT IS FURTHER ORDERED that Defendant's motion in limine [Dkt. # 35] is DENIED AS MOOT.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 23, 2011

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 23, 2011, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522